for the day. Eastern Hydroelectric Corporation versus Federal Energy Regulatory Commission. Mr. Moore. Here I am. May it please the court. My name is David Moore. I'm counsel for Eastern Hydroelectric Corporation. I'd like to reserve a few minutes for rebuttal, please. The court has three ways in which it can find petitioner Eastern Hydroelectric Corporation is correct and reinstate the license such that East Joliet Hydropower can continue to produce clean, renewable electricity. The first is through a reading of the plain language of an August 16, 2001, Section 401 water quality certification, which clearly ties a requirement for a fish passage to construction of a turbine upgrade. The second means by which the court can uphold Eastern Hydro's position and reinstate the license is by ruling that Eastern Hydropower validly withdrew its license application by virtue of 18 CFR 385.216. And we have precedent that we'll discuss today regarding that. Thirdly, the court can reinstate the license through interpretation of the plain language of the Federal Power Act, specifically Section 31B of the Federal Power Act, which requires that FERC show that Eastern Hydroelectric knowingly violated a Section 31A order. And we can show your honors that that did not occur. Under the Administrative Procedures Act, we have both procedural and legal bases on which to reverse FERC's decision and reinstate the license. If I can address first, the fish passage condition we're talking about today was a condition to a turbine upgrade. Fish passage was required by the state of Georgia as part of a Section 401 water quality certification, and that comes under a separate statutory provision under the Clean Water Act. And I hope your your honors, the court has this document, which I filed yesterday. We have a voluminous record in this matter. And so I filed it in the record. Pardon? It was already in the record, and we're familiar with the record. Thank you, your honor. And I'm referring to page three of the 401 water quality certification issued by the state of Georgia, 2001. It states, to protect and restore historical uses, a fish passage structure will be constructed as part of the project upgrade. And we contend that that language is absolutely clear that the fish passage was to be done as part of the upgrade. Right. You asked for permission to do that. You wanted a new license. You wanted a new generator. And this was a condition for doing it. And it's this has been going on for 12 years and your client hasn't done it. Now, I understand they've now decided they want they don't want to build the generator. But the problem with that is you're you're already succeeded in getting a new license that required you to construct the fish pass. And it seems to me you haven't done it. We run if I may. So this didn't involve a new license. This involved an amendment to an existing license. So I take that. I mean, I view that as one in the same day, but we'll we'll call it an amended license. But you succeeded in getting it amended, right? We did succeed in 2002. But interestingly, prior to the amendment, there's a large amount of documentation in the record that talks about exactly what was referred to in terms of a fish passage. So this structure, this is the East Juliet Dam in East Juliet, Georgia. It's got two canals are called bypasses. They exist on the side of the dam. It's actually a beautiful old historic structure. And so prior to getting this amendment and conversations with Fish and Wildlife Service, Georgia Department of Natural Resources, they said, hey, use these bypass structures. They exist there. They're going to be fine. And in fact, that's the most effective means of fish passage. Well, fast forward, really not not too long. Fast forward six months after the license amendment, then all of a sudden Fish and Wildlife Service states, no, we want something else. We would like a dental ladder. Then that moves to a serpentine ladder. Then that moves to actually a fish elevator structure. Well, what's the so are you saying that as it because one of the things that perplexed me about this case is I don't really know what's going to happen if you win and what's going to happen if you lose. It seems like so right now, as I understand it, the dam is there. It's been there since 1921. That's right. Does it have fish bypasses in it now? It has bypasses with with some modification, we contend the bypasses could effectively pass fish both upstream as well as downstream. And without without going into we were with the Cunard Mediation Center for about two years before actually bringing the case back before the court. And I can't go into that those details. I don't want to get outside the record. But it was another attempt to try to utilize that process in order to provide that fish passage. But to answer Judge Kerrigan's question, we have a license that authorizes generation to 2026. It's clean, renewable hydropower generation is very important for the nation. It's a small dam, certainly, but it is every little bit counts. And so if the court rules in our favor, then we reinstate that license. We continue to generate. And what we contend is that we tried for 12 years under a process that even Congress has recognized as broken. Congress recognized this fish passage part of this statute is so broken that in 2006, they amended the statute. This is after our license amendment. We could not go in and say, wait a minute, let's restart this process. Let's apply the 2006. Now, FERC says that you what you should have done was to seek another amendment of the license to to either get rid of the fish requirement or to modify it in some way. And what they say happened was they kept trying to chase you and you can read. I mean, it's painful to read. You can read all the back and forth and so forth. They had to chase you and chase you and chase you. And finally, they just got tired of it and revoked your license. And why isn't why isn't that a winning position? Well, specifically, because if you look at Section 31B and I won't go into the tit for tat of that, I mean, I'd be happy to, Your Honor, but there's so much of this record. I don't think Judge Corrigan's question is and we don't know the answer. But if you had just tried to amend said, look, all bets are off. Let's go back the way we were. You didn't give them an opportunity really to say yay or nay to that, did you? Actually, we did apply for amendment to the license two times. The modification to go back to the original level of generation and stop everything. Yes, yes, Justice Carnes. And in fact, shortly after it became evident that we're moving from this bypass approach to the canals to something different, Eastern Hydroelectric wrote a letter saying, hey, this is not what was part of the license agreement. Was that an official request to amend? There was two of them that were filed, Your Honor, in the record. Well, one of them was after they'd already revoked it though, right? I mean, you've tried to withdraw from the whole thing after they revoked it. But that was a little tough to do, wasn't it? This client, we didn't request to amend. What we did is we filed a notification of withdrawal, Your Honor, which is another procedure. It's out of 18 CFR 385.216, a clear procedure. It's been used before. It's been used five years after a license has actually been issued, or an application has been filed, and five years after licenses have been issued. Has it ever been used after they've already revoked your license? No. In this case, Your Honor, our filing was actually prior to the actual revocation. We filed the notice of withdrawal after the notification of intent to revoke. But we filed it before the request for rehearing. So within the Federal Power Act, the order is not final until the 60 days goes by in which a request for a hearing can be filed. We filed the withdrawal before that. Then we also filed a rehearing. Then the matter continued on for about another year until the rehearing order was issued. So we filed it timely. And in fact, there have been withdrawals filed under the same provision, 385.216, after a final license has been issued. It's been done several times. And I'll also point out that under the case law that Burke cited, in both situations, one was the Pacific Gas and Electric case and the other was the Falls Hydro Associates, those are the two cases they cite to state Eastern Hydro couldn't withdraw its application. Well, in both of those, FERC, within the 15-day period prescribed, they actually objected to the withdrawal. So those two cases, the only cases that they've cited actually support our position, which is that withdrawal is effective if 15 days goes by and FERC does not object. Now, FERC could have objected. I'm sure, I mean, you know administrative law, I'm sure better than I do. But it seems a little odd that after a final decision is made, maybe it's pending rehearing, but after a final decision has been made, then you get to take the football and go home. That seems a little bit unusual to me. Particularly when the final decision wasn't appealed. Yes, Your Honor. If we would, if FERC's view is that we should have appealed the order in 2002, and under Section 18 CFR 385, we would have 30 days to do so. I contend we had no idea what was being required in 2002 because it changed from the bypass on. But in fact, we did cite a case, the Puget Sound Energy case, where withdrawal was performed after the actual final order in that case. And it was also after a rehearing request. Ours was before a rehearing request. I understand your point, Your Honor. But our point is this. We did try to amend the license on several occasions. We sought rehearings. When we seek them and we missed them by a day or two, and it actually happened, then we're not permitted to proceed. FERC receives these orders on a website. They track them. They tracked our filing for the withdrawal. Fifteen days goes by, they did nothing at all.  You can't do this because it's untimely or you can't do this because it's final. And notably, the cases they cited don't go down the finality or the timely road either. I expected that they would, but they didn't. And that's because other orders have actually, applications have been withdrawn under the same provision. What about the merits? Your third argument, I believe, was that you had no knowing violation. What's your best argument on that? Yes, Your Honor. So a very, very high standard under Section 31A. The standard is that FERC has got to show that my client knowingly violated the Federal Power Act. So how does one know if you knowingly violated the Federal Power Act? Well, the statute's specific. It says, provide notice of the violation, an opportunity for hearing, and a reasonable time to comply. There was an order September 5th of 2013. It provided 15 days to comply with four items. My client submitted a response within 12 days to all four of those items. If you fast forward to the revocation order, what FERC does is says, we're not going to revoke it based upon those four items in that September 5th 31A order. Instead, we're going to look at the totality of the body of the circumstance and say, you haven't implemented fish passage, and so we're going to revoke your license for that purpose. Well, I submit to the Court that there's nowhere, there's not a single piece of the record where it states, build fish passage by a date certain. And that's the kind of thing that Section 31A requires. It would require build fish passage, and it would require a date. If that date was unreasonable, we'd have a right to appeal. But we were never given an opportunity for that date. So how could we knowingly violate this body of 12 years which is recited in FERC's brief? And I have a difficult time making it out because there's so much different information. So, and here's the problem, because I mean, it's not, at least I personally am not without some sympathy for your client's situation. But even as late as 2014, the FERC staff issues order to cease generation on April 17th of 2014, and they write you twice trying to resolve the matter before it goes final. And they don't hear from you, and then it goes final on July 17th. And actually, it doesn't even go final until August. So I guess the problem is, why was there such failure to communicate? Well, this is why Congress passed the amendments to ECPA. And I see I'm out of time. May I continue to answer, Your Honor? Yes, but make it brief. Okay. The ECPA amendments were passed to provide licensees like ourselves an opportunity for a hearing and specific timelines of 90 days in which we could provide an alternative. And if our alternative was as good as the resource agencies, then by law, it would have to be accepted. We didn't have that opportunity here. So instead, we went for 12 years. And that's why the record is as it is, Your Honor. You've saved three minutes for rebuttal, Mr. Moore. Yes, sir. Thank you, Your Honor. Mr. Solomon. May it please the Court, Robert Solomon for the Federal Energy Regulatory Commission. First, allow me to apologize for the delay this morning. Turning to the merits of this case, let me start with the last point first. With respect to the knowing violation, which is required by Section 31 of the Federal Power Act, the Commission, in its brief, has focused on all 12 years of knowing noncompliance. We sought to bring the licensee back into compliance with the terms of the license. The Commission did not act hastily, but after 12 years and after 12 warnings that the Commission might initiate enforcement activities, and after two show cause orders and two complaints. What about the argument your opponent makes that once they entered into this amendment, that the FISH people, I'm sorry, I don't know all the acronyms, but that they kind of moved the goalposts. In other words, that there was an amendment that was agreed to, and they knew there was going to have to be provisions made for the FISH. But then when they actually got into it and were having to do it, there were more requirements put on. For example, I think monitoring and things like that that weren't necessarily, I couldn't tell if they were contemplated at first. I think these measures were contemplated. The orders contemplate a FISHway design, a FISHway construction schedule, and effectiveness protocols to ensure that the FISH are actually migrating past the Juliet Dam. Your Honor is correct. In the license itself, the 2002 license amendment, there is not specificity. What the Commission required in the license and what the Georgia Department required in its Clean Water Act certificate is for the licensee to consult with the appropriate resource agencies, the Georgia Department, the U.S. Fish and Wildlife Service, and the U.S. National Marine Fishery Service. This should not have come as a surprise to the licensee because the period before the license amendment issued, 1999 to 2002, the record is replete with communications between the three resource agencies, the licensee, and the FERC. Yes, Petitioner is correct. At one point in January 2000, a representative of the Fish and Wildlife Service did communicate with the licensee and say that we recommend that you consider usage of the existing bypass channel for purposes of fish passage. But what really matters is the license, which is effectively a contract between the agency and the licensee. And there is no suggestion whatsoever that the bypass canal would be appropriate to satisfy the fishway requirement. The Petitioner repeatedly cites to the 2013 compliance order as being the entire focus of notice. We believe that we have well satisfied all of the requirements of the 2013 compliance order, but the notice which is required under Section 31 of the Federal Power Act is found not just simply in the 2013 order, but in the orders and letters that preceded that compliance order and the orders that followed the 2013. Okay, can I just interrupt you a second? So there's a dam that's been there since 1921. And under this license, which was set to expire in 2026, there was electricity being generated through this dam. And I guess there were some fish pass-throughs, although I guess they were not deemed to be sufficient. So now you've revoked this license. So now they're not generating the electricity, but the dam's still there and the fish still aren't getting it. I guess if that's what the issue was. So how does this end? Or what's the, what are, is this just an exercise because we have laws and we have rules and you didn't follow them and so now we have to do something about it? What's the endgame here? Well, the endgame, of course, is satisfaction of the statutory and regulatory responsibilities that my agency must adhere to. But I understand, Your Honor, and as the Commission said in the final paragraph of the revocation order, regulatory authority over the dam now passes from the federal government to the Georgia Dam Regulatory Authorities. Before the Commission revoked, there were various parties that came in and asked the Commission to do more about the project facilities and about the dam. And in particular, American Rivers and the Altamaha Riverkeeper said that my agency should go actually farther than it actually did, recognizing the financial constraints upon petitioner. All the Commission ordered here was for the licensee to... The river folks wanted you to tell them to tear the dam down. Did you even, do you have that authority? We have broad remedial authority under Section 309 of the Federal Power Act to undertake any and all activities as necessary. Having said that, it is extremely rare for my agency to order dam decommissioning or removal. The environmental groups came in and said, we want more than simply the disabling of the generating equipment. We want the generating equipment removed. And we want you to consider either decommissioning or removal of the dam. What my Commission said is, we will stop at the disabling. It doesn't seem to make any sense for the financially strapped petitioner to be ordered to remove the project facilities and left it at that. So the Georgia authorities now, now that you're out of the picture, there's no power being generated, they have the power to order the dam to be torn down? Yes. And my agency tried over 12 years to promote a fish passage at the dam. But as we did here and as we have done in other cases. Let's say they had never gotten ambitious and wanted to generate more power and the status quo was everything's what it was. You all would have had no power to come in and stop them from the amount of power, from generating power that they were doing before the first application. That is exactly correct, Your Honor. Section 6 of the Federal Power Act, 16 U.S.C. Section 799, says that a license cannot be amended unilaterally. Rather, it requires the mutual agreement. So was it like a quid pro quo effectively that the deal was, we're going to let you generate more electricity, but we're going to, we need you to add this fish requirement into it? Is that, is that more or less what happened? That is more or less what happened. Because as Judge Carnes said, you otherwise wouldn't, otherwise they could have generated the same amount of electricity until 2026 and the fish would be, that you couldn't require what the amended license requires. That is correct, Your Honor. And it is unusual in this Federal scheme here. My agency, the FERC, is the lead licensing agency. Yet other Federal and State resource agencies have a role as well under Section 401 of the Clean Water Act. The Georgia Department of Natural Resources has to issue a Clean Water Act certificate. And under the Clean Water Act, the State of Georgia effectively has the ability to veto the Federal project if the State does not provide a certificate. If it does provide a certificate under the statute, the conditions of that certificate become a term of the Federal license, which is what happened here. The 2002 License Amendment picked up verbatim the four conditions of the Georgia Department, including Condition 4, which Petitioner led with here. And I want to indicate the obvious. The State of Georgia disagrees with Petitioner's interpretation of the Georgia condition. The State of Georgia, continuously throughout this proceeding, has focused on fish passage at the dam, that there is no tie between the License Amendment and the fish passage other than the initial timing in 2002. Judge Carnes, you're correct. It was the License Amendment that allowed the State of Georgia and the two Federal resource agencies to come in and require a particular type of fishway. If the licensee had not sought the amendment, the licensee and the FERC would have been compelled to abide by the terms and conditions of the 40-year license. Once they got entree, they're not leaving. And I gather if the company came back and said, let's make up, you know, we had some procedural missteps, we'd like to go back again and have a license for our original level of power generation, at this point the Georgia environmental agencies can come through and put the kibosh on that because of the passageway issue, correct? Yeah, yes, Your Honor, I think so. And that's why the consultation requirements are so important. What the Commission required in 2002 in the amended license, and in the 2007 and the 2013 Compliance Orders, and in the Show Cause Orders, and in the 2006 Fish Lift Order, and the 2012 Deneal Fishway Order is, above all else, for the licensee to consult effectively and to provide my agency documentation of consultation with the Georgia Department and the two Federal agencies that have the word fish in their titles. Not only do these agencies have particular expertise in the design of fishways and appropriate effectiveness protocols, but these agencies have prescriptive obligations that they can impose on the Federal Government. The State of Georgia has Clean Water Act authority, the Fish and Wildlife Service, and the National Marine Fishery Service. They have authority under Section 18 of the Federal Power Act, 16 U.S.C. Section 811, to actually prescribe, to require particular fishway requirements. Here in the 2002 license amendment, the Commission construed the late submission of the Fish and Wildlife Service and the National Marine Fishery Service as more of a recommendation as opposed to a mandatory prescription. But really, with respect to the design of the fish passage, yes, the ball really is primarily in the Georgia Department's court. What about the knowing violations? Well, we believe the 12-year history of this case demonstrates the knowing violation. The licensee argues that the 2013 compliance order did not provide specificity. But the 2013 order starts, the very first sentence starts with the licensee is not in compliance with ordering paragraph E of the 2012 Deneal fishway order. And what the 2012 Deneal order said, consistent with the 2002 license amendment, is there needs to be consultation with these resource agencies and there has to be documentation that is provided to my agency. And we hope after 12 years of effort that the Georgia Department will, in fact, be able to work something out with the licensee. Can you talk briefly about the new law that your opponent talks about? I know it doesn't necessarily apply here, but if it applied retroactively, let's say, would it change the way this would have come out? It might have because Sections 18 was amended in 2005. Section 33, 16 U.S.C. 823D was added in 2005. And Congress is sensitive to this particular issue and has provided now for provisions that allow a licensee, if it disagrees with the recommendations or prescriptions of the other resource agencies, to request a hearing before the resource agencies or to offer an alternative. But as the 2002 order demonstrates, the Commission agreed with the three resource agencies that their recommendations as to fish passage at this particular dam to allow for fish passage past this dam is entirely appropriate. Thank you, Your Honor. Mr. Moore, you've saved three minutes. Thank you, Your Honor. Your Honor, based upon what counsel just stated, I think the Court has got a rule in favor of Eastern Hydroelectric because you heard him agree that there is a higher standard, the knowing violation standard, that's in Section 31A. He also stated that the 2002 order, and this is a quotation, was not specific. So how does one provide notice of a requirement under Section 31A meet the heightened standard of a knowing violation and point to what essentially is a 12-year record? And that's our contention, Your Honor. And to answer further Justice Kerrigan's question about, well, why did things happen between the May, the September 2013 order, requests to show cause and these other items, if you look at the entirety of the record, everything culminates in that September 5th, 2017 document. And contrary to... You don't mean 2017? I'm sorry, 2013, September 5th, 2013. And we don't argue that the September 5th, 2013 document's not specific enough. To the contrary, we argue it is specific enough. It's actually the only thing that was specific enough here to meet the criteria of 31A. But we answered all four of those items within 12 days. They gave us 15 days. The statute requires 15 days. Now, let me go into why is FERC's interpretation that it's this body of 12 years from 2002 to 2014. Why is that wrong? Well, it's the plain language of the statute. The statute refers to these orders as a single final order. So let me read 31B, revocation order. FERC has got to show that a licensee has knowingly violated a final order, a final order. FERC's also got to show that the licensee has been giving a reasonable time to comply fully with such order, referring to a order. And then further on in the passage, it states that there's judicial review of the order. Now, we could have gotten judicial review of the 2002 order in 2013 or 2014. You can't do that. If you do that, you file it. FERC says under 285713, the regulations, you have 30 days. You didn't file an appeal. So that option wasn't available. And Justice Kerrigan, that explains to some extent why you saw the procedure that you saw following the 2013-2014. I'm running out of time. Let me also add, counsel is absolutely wrong about the bypass. There's an environmental assessment that's required under the National Environmental Policy Act to be issued with this license amendment. It was indeed issued. And that's on document record 259. There's a picture of the bypass reaches, the bypass canals that I spoke about. That was what was contemplated by FERC in 2002. So you must rule in favor of Eastern Hydroelectric because the order was not specific. Counsel also just stated that there were several iterative requirements, a ladder, a lift, a bypass reach. He actually agreed with us. And so therefore, there really was not the specificity required under Section 31A to meet the heightened knowing requirement. With that, I'll cede my time. Thank you, Mr. Moore. We have your case. We're in recess until tomorrow morning.